IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

SAMORA MYLES,

     Defendant.

CRIMINAL ACTION FILE NO.

1:20-CR-479-ELR-JKL

## FINAL REPORT AND RECOMMENDATION

Defendant Samora Myles is charged in this case with one count of possession with intent to distribute methamphetamine and one count of unlawful possession of six firearms in furtherance of a drug trafficking crime.  [Doc. 1.]  The case is before the Court on Mr. Myles's Motion to Suppress Evidence, in which he seeks to suppress evidence that Cobb County Police Department officers seized from his residence on February 8, 2019.  [Doc. 15.]  On July 28, 2021, I held an evidentiary hearing.  [Doc. 34 ("Hr'g Tr.").]  Two officers involved in the search—Officer Bora Balkan and Officer Joseph Sterner—testified at the hearing.  Following the hearing, Mr. Myles filed a post-hearing brief [Doc. 45], after which the government filed a response [Doc. 47], and Mr. Myles a reply [Doc. 48].  For the reasons that follow, it is **RECOMMENDED** that Mr. Myles's motion be **DENIED**.

## I.   BACKGROUND

On February 8, 2019, Officer Sterner, Officer Balkan, and two other officers with the Cobb County Police Department were dispatched to Mr. Myles's residence in Acworth, Georgia, following a noise complaint about barking dogs and possible narcotics activity.  (Hr'g Tr. at 7-8, 30-31.)  Upon their arrival, the officers heard dogs barking in the garage, and when Officer Sterner reached the front door of the house, he smelled marijuana.  (*Id.* at 8-9, 31).

Officer Sterner then knocked on the door.  (Hr'g Tr. at 31; Gov't Ex. 5[1] at 0:08.)  Samantha Myles (Mr. Myles's sister) answered.  (Gov't Ex. 5 at 0:10.) Officer Sterner told her he had received a noise complaint about dogs and asked preliminary questions about where the dogs were kept, what kind of dogs they were, and how old they were.  (*Id.* at 0:12-27.)  Officer Sterner then asked, "Can I come inside and talk to you about it?"  (*Id.* at 0:28.)  Ms. Myles responded "Yeah," and opened the door wider in order to allow Officer Sterner to enter.  (*Id.* at 0:29.) At least one other officer also entered the residence at that time.

---

[1] Government's Exhibit 5, which was admitted into evidence at the suppression hearing, is a video from Officer Sterner's bodycam.  When citing to specific portions of the video, I cite to the run time of the video, rather than the time stamp on the video itself.

Behind the front door was a small foyer area at the base of a staircase leading upstairs, and immediately to the left of the door was the living room.  Because of the open floorplan, Officer Sterner immediately found himself in the living room. (Gov't Ex. 5 at 0:30-33.)  There, he encountered Sha Goodrich, who was walking into the living room from the other side of the room nearest the kitchen; Officer Sterner also asked her questions about the dogs.  (*Id.* at 0:30-41.)

Officer Sterner then noticed an even stronger odor of marijuana and saw a marijuana grinder containing marijuana in plain view on a couch in the living room, at which point he observed aloud, "They got a little bit of a weed issue, I guess." (Gov't Ex. 5 at 0:43; *see also* Hr'g Tr. 9-10, 32-33.)  At that point, Ms. Myles was still in the foyer area at the base of the stairs.  Officer Sterner asked her if there was additional marijuana in the home, adding that "if you've got personal use, that's not a big deal, okay?"  (Gov't Ex. 5 at 0:57; Hr'g Tr. at 33, 41.)  Officer Balkan, who was standing in the threshold of the front door interjected that the officers were not there to ruin the women's lives.   (Gov't Ex. 5 at 1:01.)   Ms. Myles acknowledged having some marijuana, but just enough for "personal usage."  (*Id.* at 0:54.)  Officer Sterner asked, "So are you talking about a couple of grams?" to which she responded, "No."  (*Id.* at 1:02.)  He then asked "you talking about like

3

30-40 pounds?" (Gov't Ex. 5 at 1:08.) Laughing, she again responded, "No." (*Id.*) Officer Balkan added, "We want to make sure it's not like a grow house." (Gov't Ex. 5 at 1:09.) She responded, "It's my day off, sir." (*Id.* at 1:11.)

Officer Sterner then asked, "Where is the rest of your weed?" (Gov't Ex. 5 at 1:18.) In response, Ms. Myles ran upstairs, presumably to obtain more marijuana. (Hr'g Tr. at 11, 33.) Officers Balkan and Sterner followed her out of concern that she might be running to get a weapon. (*Id.* at 33-34.) When the officers reached the top of the stairs, Ms. Myles met him on the landing holding a jar containing marijuana, which she told Officer Sterner came from Ms. Goodrich's bedroom. (*Id.* at 34; Gov't Ex. 5 at 1:34-46.) Officer Sterner confirmed with Ms. Myles that another door across the landing led to her own bedroom, and asked Ms. Myles if he could look in her room. (*Id.* at 1:51.) She said he could. (*Id.*) Officer Balkan entered and searched Ms. Myles's room. (*Id.* at 1:54.)

Officer Sterner also asked Ms. Myles to call Ms. Goodrich upstairs. (Gov't Ex. 5 at 1:47.) Ms. Myles complied, and several seconds later, as Ms. Goodrich was at the base of the stairway, Officer Sterner said "C'mere girl!  What you got weed up in your room for?" (*Id.* at 1:57-2:01.) Ms. Goodrich then started upstairs and said that she had been smoking marijuana because it was her "day off." (*Id.* at

4

2:01-05.)  Once Ms. Goodrich reached the top of the stairs, Officer Sterner asked her if that was all the marijuana she had; she responded yes, and then Officer Sterner asked if he could look in her room.  (*Id.* at 2:05-2:11.)  She did not reply, and instead moved a couple of feet into her room.  Officer Sterner told her, "I don't want you reaching around just in case you have weapons or something."  (*Id.* at 2:11-18.)  He asked again if she would "mind if [he] took a look" and mentioned that he could see that she had some bongs in the bedroom.  (*Id.* at 2:18-23.)  She still did not respond.  He then said if she just had a little bit of weed, it would not be that big of a deal.  (*Id.* at 2:24.)

Ms. Goodrich then moved further into the room, toward a nightstand to the right of the bed.  (Gov't Ex. 5 at 2:26.) Officer Sterner told her to come back toward him.   (*Id.* at 2:28.)   Meanwhile, Ms. Myles, who was outside the bedroom, mentioned something about a search warrant.  (*Id.* at 2:31.)  Hearing this, Officer Sterner responded, "Do you want a search warrant?" and Ms. Myles responded no. (*Id.* at 2:33.)  As this exchange unfolded, Ms. Goodrich again moved toward the nightstand, and Officer Sterner told her to stop.  (*Id.* at 2:35.)  He explained that marijuana had been found in her room; that they did not want it to "turn into a big thing to get a search warrant"; but that if she didn't mind them looking, "we can

deal with it."[2]  (*Id.* at 2:37-47.)  He also warned that if the woman wanted the police

to get a search warrant, the officers would go obtain one and search the entire house.

(*Id.* at 2:49-51.)  Ms. Myles explained they didn't want the officers to do that.  (*Id.*

at 2:52-53.)

Officer Sterner asked Ms. Goodrich again if he could look in her room, and

said "I know you've got a little bit more [marijuana] because you're freaking out."

(Gov't Ex. 5 at 2:54-58.)  She then turned to the nightstand, which was directly

behind her, grabbed a grinder, and showed it to Officer Sterner.  (*Id.* at 3:01.)  He

then told her that he didn't care that she had a little bit of marijuana and a grinder,

and asked if he could "look to check to make sure."  (*Id.* at 3:02-09.)  She responded

"Go ahead."  (*Id.* at 3:10.)

Officer Sterner walked into the bedroom and toward the nightstand, near

where Ms. Goodrich was standing.  (Gov't Ex. 5 at 3:13.)  Soon after, he noticed a

gun on the nightstand.  He asked if she had any weapons, and she reached toward

the nightstand.  (*Id.* at 3:18-21.)  He told her to stop reaching, and asked her to

leave the room with him.  (*Id.* at 3:22-24.)  Outside the room, he explained that he

---

[2] In this context, "It" refers to a "a little bit of weed."  (Gov't Ex. 5 at 2:44-47.)

did not want her reaching around, especially with a gun on the table.  (*Id.* at 3:40.) He then asked if it was her gun, and she responded that it was not.  (*Id.* at 3:52.)

Officer Sterner then went back into the room and called Officer Balkan into the room so he could call in the serial number of the gun to determine whether it was stolen.  (Gov't Ex. 5 at 3:55.)  Meanwhile, outside the bedroom, the women started to argue about why Ms. Goodrich had consented to the search of her room. (*Id.* at 4:48.)  Officer Sterner then returned to the landing and asked Ms. Goodrich to clarify if he could search the rest of the room.  (*Id.* at 4:55.)  She said that he could go ahead and look for "weed."  (*Id.* at 5:07.)  She then asked "What am I giving you permission to do?" (5:14)  He responded, to search her room for "weed, drugs, or weapons."  (*Id.* at 5:18.)  Ms. Goodrich, then said that the room was Ms. Myles's brother's room and that it was Ms. Myles's house.  (*Id.* at 5:20-30.)  At that point, Officer Sterner handcuffed Ms. Goodrich and Ms. Myles, and said that the police would obtain a warrant.  (*Id.* at 5:32.)

While that was happening, Officer Balkan was still in Ms. Goodrich's bedroom, walking around with a flashlight.  He called Officer Sterner back into the room and showed him what appeared to be ecstasy, or methylenedioxy-

methamphetamine ("MDMA"), pills in plain view on a shelf of the nightstand. (Hr'g Tr. at 18, 36; Gov't Ex. 5 at 6:15.)

Ms. Goodrich and Ms. Myles were taken downstairs and seated in the living room.  Officer Sterner returned downstairs and asked Ms. Goodrich and Ms. Myles if there was anyone else in the residence.  (Hr'g Tr. at 37.)  They said that they were not sure.  (*Id.*)  Officer Sterner also asked if anyone stayed downstairs in the basement, and either Ms. Goodrich and Ms. Myles responded that people did stay there, including Mr. Myles.  (*Id.*)  Concerned that someone could be downstairs in the basement, Officer Balkan and Officer Sterner conducted a protective sweep.  (*Id.*)  During the sweep, they identified a suspected pill press, other items that could be used to manufacture MDMA pills, and multi-colored powder that resembled the color of the suspected MDMA pills observed in Ms. Goodrich's bedroom.  (*Id.* at 19, 37-38.)  No other individuals were located during the sweep.  (*Id.* at 19, 38.)

Officer Balkan then left the scene and went to his precinct where he swore out a search warrant before a Cobb County Magistrate Judge.  (Hr'g Tr. at 20.) While he was gone, Officer Sterner interviewed Ms. Goodrich and Ms. Myles.  (*Id.* at 38.)  Ms. Myles stated that Mr. Myles was with a friend purchasing another dog.

(*Id.* at 39.)  She called Mr. Myles, and handed the phone to Officer Sterner to speak

with him.  (*Id.*)  Mr. Myles did not, however, return to the house.  (*Id.*)

After receiving the search warrant, Officer Balkan returned to the residence,

and the search of the residence began.  (Hr'g Tr. at 21.)  Officers located and seized

several firearms and other pills from Ms. Goodrich's room; and with the assistance

of a narcotics unit, they also seized the suspected pill press from the basement.  (*Id.*

at 21, 22.)

## II.   THE PARTIES' ARGUMENTS

Mr. Myles argues that the evidence seized from the residence should be

suppressed because neither Ms. Goodrich nor Ms. Myles gave valid consent to

enter or search the residence, but rather acquiesced "to a show of authority."  [Doc.

45 at 1.]  Among other things, he highlights that:

- Officer Sterner asked if he could come into the house to talk about the noise complaint, yet other officers also entered;

- Officer Sterner lifted a pillow on a couch and looked underneath it before asking for consent to search;

- Officer Sterner gave "false assurances" to Ms. Myles and Ms. Goodrich that the police were not interested in personal use quantities of marijuana;

- the officers followed Ms. Myles up the stairs without asking consent to do so;

9

- Officer Sterner "pushed them to consent and threatened them with detention and getting a search warrant when they did not comply";

- none of the officers affirmatively told Ms. Goodrich and Ms. Myles that they could refuse consent;

- the women did not give blanket consent to search the house and asked for clarification on what the officers were looking for; and

- the officers continued to look in Ms. Goodrich's bedroom even after the officers understood that she had revoked consent. [*Id.* at 4-5.]

The government, meanwhile, contends that the officers were granted consent to enter the home and to search the bedrooms, and that consent was validly provided. [Doc. 47 at 10-13.] In the alternative, the government argues that even if the officers did not have a lawful basis to follow Ms. Myles up the stairs or search the bedrooms, the evidence seized from the home should not be suppressed because, under the independent source doctrine, the officers ultimately obtained a search warrant for the home that was supported by sufficient information to establish probable cause. [*Id.* at 13-14.]

Mr. Myles has filed a reply, largely reiterating the arguments he made in his initial brief. [Doc. 48.]

10

### III.   ANALYSIS

The Court divides it analysis of the parties' suppression arguments between issues concerning the officers' entry into Mr. Myles's home and those involving the subsequent search of the premises, starting with the former.

### A.   The Officers Lawfully Entered the Home Based on Ms. Myles's Consent

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  "A warrantless entry into a suspect's home to search the premises is presumed to be unreasonable." *United States v. Ramirez-Chilel*, 289 F.3d 744, 751 (11th Cir. 2002).  There are exceptions, however, including for entries and searches conducted pursuant to consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *United States v. Stiner*, 551 F. Supp. 2d 1350, 1357 (M.D. Fla. 2008) ("When determining that consent has been given, irrespective of whether the consent goes to a search for evidence or entry into a residence, the Court must . . . determine that the consent was voluntary.").

Where the government relies on the consent exception—whether it be the consent of the defendant or the consent of another individual—it has the burden of

11

showing that such consent was voluntary.[3]  *See United States v. Matlock*, 415 U.S. 164, 171 (1974) ("[W]hen the prosecution seeks to justify a warrantless search *by proof of voluntary consent*, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party . . . ." (emphasis added)); *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968) (holding that a prosecutor who relies on consent to justify a search must show that such consent was freely and voluntarily given); *see also United States v. Antone-Herron*, 593 F. App'x 960, 963-64 (11th Cir. 2014) (considering co-occupant's consent to enter and search home); *United States v. Weeks*, 666 F. Supp. 2d 1354, 1373-74 (N.D. Ga. 2009) (same).  In assessing whether a person's consent was voluntary, the Court considers factors including the presence of coercive police procedures, the extent of the consenter's cooperation with the officers, the person's awareness of his or her right to refuse consent, the person's education and intelligence, and the person's belief that no incriminating evidence will be found. *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001); *Weeks*, 666 F. Supp. 2d at 1374.

---

[3] Mr. Myles does not contest that the women had authority to consent to entry of the home or to search the bedrooms.

Considering the totality of the circumstances, the most salient factors regarding the officers' request to enter the house are the absence of any coercive police procedures and Ms. Myles's initial cooperation. Officer Sterner knocked on the door in a normal fashion, and Ms. Myles answered without an undue delay. Officer Sterner's tone throughout their entire encounter was pleasant and cordial. He did not threaten or coerce Ms. Myles, and neither he nor any of the other officers had their weapons drawn. Ms. Myles, meanwhile, was also calm and cooperative, and she readily agreed to allow Officer Sterner to enter the residence.

Mr. Myles nevertheless argues that the officers' entry into the home was unreasonable because Officer Sterner only asked for and received permission for him to enter, not the other officers. [Doc. 45 at 4; Doc. 48 at 1.] Although Mr. Myles is correct that Officer Sterner asked if he could enter the residence, the context of the encounter shows that the scope of Ms. Myles's consent extended to the other officers as well. Critically, Ms. Myles did not object to the additional officers entering the house, and "[f]rom this it can be inferred that the aid given [Officer Sterner] by the additional agents was within the scope of [Ms. Myles's] consent." *United States v. Mendez*, 431 F.3d 420, 427 (5th Cir. 2005); *see United States v. Brito-Arroyo,* No. 1:17-CR-337-TWT-RGV, 2019 WL 2361052, at *27

13

(N.D. Ga. Mar. 4, 2019) (finding that agents did not exceed the scope of consent to enter residence where occupant "did not attempt to either limit or revoke her consent" when she "saw the number of agents that entered the residence to conduct the search"), *report and recommendation adopted in relevant part*, 2019 WL 2355147 (N.D. Ga. June 4, 2019), *aff'd*, No. 20-10974, 2021 WL 3661200 (11th Cir. Aug. 18, 2021).

Mr. Myles also argues that Officer Sterner "pushed the envelope and exceeded the bounds of consent" when he lifted a small throw pillow on the couch to look under it without explicit consent to search there. [Doc. 45 at 4; Doc. 48 at 1.] The government does not attempt to justify his lifting of the pillow, and the Court agrees that Officer Sterner lacked consent to look under the pillow. Nevertheless, Officer Sterner's lifting of the pillow does not render Ms. Myles's initial consent for the officers to enter the residence invalid because he moved the pillow only ***after*** he entered the home and after consent had been obtained. Nor does is appear that either Ms. Myles or Ms. Goodrich were even aware that he had lifted up the pillow, so his lifting of the pillow could not have been interpreted as coercive police conduct.

Mr. Myles next complains that Officer Sterner gave the women false assurances that having a personal use quantity of marijuana was "no big deal." [Doc. 48 at 1.]  In the Eleventh Circuit, police deception is among the many factors that a court considers when evaluating the voluntariness of consent.  *See United States v. Spivey*, 861 F.3d 1207, 1214 (11th Cir. 2017).  Deception does not automatically render consent invalid; rather, some degree of police deception will be tolerated, so long as the individual's will is not overborne.  *Id.*  Unfortunately, neither party does a good job developing this argument.  Mr. Myles does not cite any authority for the proposition that minimizing the legal severity of possessing a small amount of marijuana rendered the consent to enter the home or any subsequent consent to search invalid.  The government, meanwhile, does not even acknowledge Officer Sterner's statements that possessing a personal amount of marijuana was "no big deal," leaving Defendant's argument unanswered.

The Court does have concerns that Officer Sterner's repeated comments to the women—that possessing a small quantity of marijuana was "no big deal"— may have created the false impression that no adverse consequences would result from a search that yielded only a personal use quantity of marijuana, and as a result, that the comments may have been coercive.  But the Court need not decide whether

15

the comments tip the scales against the government because, similar to Officer Sterner's lifting of the throw pillow, his comments minimizing the seriousness of marijuana possession occurred only *after* Ms. Myles had validly consented to the officers' entry into the residence.  Thus, there is no causal connection between those comments and Ms. Myles's consent to enter the residence.

For these reasons, considering the totality of the circumstances, the Court finds that Ms. Myles's voluntarily provided consent to the officers to enter the house, and that her consent was not coerced or the product of acquiescence to a show of official authority; therefore, the officers' initial entry into the residence did not violate the Fourth Amendment.

### B.    Evidence Seized After the Officers' Initial Entry is Subject to the Independent Source Doctrine.

Mr. Myles argues that, even if the officers lawfully entered the house, they were not lawfully present on the second floor since Officer Sterner failed to ask for consent before going upstairs to the bedrooms.[4]  [Doc. 45 at 4.]  He further argues

---

[4] Mr. Myles argues that Officer Sterner "followed the women up the stairs without asking consent to do so."  [Doc. 45 at 4.]  This is not an accurate or complete description of what happened.  Officer Sterner did not follow both women upstairs; rather, he and Officer Balkan followed Mr. Myles up the stairs after she started walking up the steps in response to Officer Sterner asking "where is the rest of your weed."  (Gov't Ex. 5 at 1:27) [Doc. 31-1].

16

that Officer Sterner "pushed" Ms. Myles and Ms. Goodrich to consent to a search of their rooms and "threatened them with detention and getting a search warrant when they did not comply." [Doc. 45 at 5.] The Court need not decide, however, whether the remainder of the search falls within the consent exception, because the evidence seized following the officers' entry into the home is subject to the independent source doctrine.

The independent source doctrine is an exception to the exclusionary rule under which a court may admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source. *See Murray v. United States*, 487 U.S. 533, 537 (1988). The Court applies a two-part analysis to determine whether evidence seized during the execution of the warrant was discovered independent of an initial illegal entry:

> The first thing we do is excise from the search warrant affidavit any information gained during the arguably illegal initial entry and determine whether the remaining information is enough to support a probable cause finding. If the remaining or nonexcised information is enough to support a probable cause finding, the second thing we do is determine whether the officer's decision to seek the warrant was "prompted by" what he had seen during the arguably illegal entry. To determine whether an officer's decision to seek a warrant is prompted by what he saw during the initial entry, courts ask whether the officer would have sought the warrant even if he had not entered. If the officer would have done so, his decision to seek the search warrant is supported by an "independent source," and the evidence

seized under the warrant is admissible regardless of whether the initial entry violated the Fourth Amendment.

*United States v. Noriega*, 676 F.3d 1252, 1260-61 (11th Cir. 2012) (citations omitted).

As noted above, Officer Balkan applied for the warrant to search the residence. In his affidavit in support of the application, he provided the following information to establish probable cause that the crimes of possession of a controlled substance and theft by receiving a stolen firearm had been committed:

> Officer Sterner, Officer Larson, Recruit Holmes, and I were dispatched to [Mr. Myles's address in] Acworth, GA 30102 in reference to an anonymous complaint of possible animal abuse and narcotics activity.
>
> Dispatch advised that the complainant stated for the past 6 months they had noticed the neighbor had been keeping multiple dogs in their garage. The complainant advised when the garage door is open, they can see multiple dogs in cages stacked on top of one another. The complainant also advised they can smell the odor of narcotics coming from the residence.
>
> Officer Sterner and Officer Larson arrived first on scene. Officer Sterner informed the homeowner, Samantha Myles, of the complaint we received and asked for permission to enter into the residence and Samantha consented. Officer Sterner advised me that he smelled the odor of marijuana emanating from the residence prior to ever crossing the threshold into the house with Samantha's consent. Officer Sterner noticed a grinder containing marijuana in plain view on the couch in the living room.

18

We also spoke to Sha Fullington-Goodrich, who advised she was living at the residence as well.

Officer Sterner asked if there was any more marijuana in the residence and Samantha ran up the stairs to go provide Officer Sterner with the marijuana. I followed behind Samantha upstairs and she handed me a jar containing marijuana in it.

We obtained consent from Samantha to search her room and Officer Sterner obtained consent from Sha to search her room.

In Samantha's room, I located a jar containing marijuana on the nightstand next to the bed.

Officer Sterner located a .38 caliber Taurus Defender bearing serial number JW64714 in Sha's room, which Sha stated belonged to her boyfriend. Sha also stated she was unsure if 'someone' was in the basement I ran the serial number through GCIC and it returned as stolen through the Hancock County Sheriff's Office.

I observed a clear plastic bag in the nightstand next to the bed containing approximately 100 multi-colored pills I suspected to be MDMA (commonly known as Ecstasy) which I can identify based on my training and experience.

As Officer Sterner was speaking to Sha about the firearm, Samantha interjected and asked Sha why she allowed Officer Sterner to search the room. Sha then stated she was unsure why, and Officer Sterner again asked Sha if he had consent to continue searching her room for weapons and narcotics. Sha repeatedly [asked] Officer Sterner what he would be searching for and would not give a clear answer to Officer Sterner if he could continue searching her room.

Officer Sterner and Officer Larson detained Sha and Samantha in handcuffs and advised them we would apply for a search warrant for the residence.

Officer Sterner and I conducted a protective sweep of the basement due to Sha indicating that 'someone' may be down there.

While conducting our protective sweep, we observed in plain view more MDMA pills, a strainer with MDMA powder, and a pill press all indicative of manufacturing based on my training and experience.

(Gov't Ex. 2 at 1, 3 [Doc. 29-2 at 1, 3].)

As noted above, the first step in applying the independent source doctrine requires that the Court excise any illegally-obtained information from the application and determine whether the remaining information establishes probable cause to support the issuance of a search warrant. "Probable cause exists when under the 'totality-of-the-circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Albury*, 782 F.3d 1285, 1292 (11th Cir. 2015) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Even assuming, without deciding, that the information obtained by officers after Ms. Myles ran upstairs was acquired in violation the Fourth Amendment, Officer Balkan's truncated statements still establish probable cause to support issuing the search warrant. The remaining, unexcised portion of the affidavit establishes that the officers received a complaint about possible narcotics activity; that Officer Sterner smelled the odor of marijuana even before crossing the threshold into the house; and that once inside the residence he observed

a grinder containing marijuana in plain view on the couch in the living room. These facts are more than sufficient to establish probable cause to believe that the residence would contain evidence of drug possession of a controlled substance, namely, marijuana, in violation of Georgia law. *See* O.C.G.A. § 16-13-30(a).

Next, the Court must determine whether the officers would have sought the warrant even if they had not gone upstairs, searched the bedrooms, or conducted a protective sweep. This determination is a question of fact. *See Noriega*, 676 F.3d at 1263. Here, Officer Sterner testified that he would have sought a warrant to search the residence, even if he had not been given consent to enter the home. (Hr'g Tr. at 32.) The undersigned found Officer Sterner's testimony on this point convincing, and in the absence of countervailing evidence, the government has met its burden to show that the officers would have sought the search warrant even without the fruits of the allegedly illegal searches. *See United States v. Thomas*, 818 F.3d 1230, 1244 (11th Cir. 2016) (agent's testimony that he would have sought a search warrant regardless of the results of alleged unlawful search is sufficient to establish second prong of the independent source doctrine analysis). As a result, the later searches are independently supported by the warrant, and the evidence seized is admissible, even if some of the searches between when the officers'

entered the house and when they obtained the warrant arguably violated the Fourth Amendment.

In sum, the Court finds that even if the officers did not obtain valid consent to search the bedrooms, the evidence seized during the later search should not be suppressed based upon the independent source doctrine.

## IV.   CONCLUSION

For the foregoing reasons, the undersigned finds that the officers' initial entry into the residence was lawful because Ms. Myles consented to it, and that even if any subsequent searches violated the Fourth Amendment, the evidence seized should not be suppressed based upon the independent source doctrine.  It is therefore **RECOMMENDED** that Mr. Myles's motion to suppress [Doc. 15] be **DENIED**.

I have now addressed all referred pretrial matters relating to Mr. Myles and have not been advised of any impediments to the scheduling of a trial.  Accordingly, this case is **CERTIFIED READY FOR TRIAL.**

IT IS SO RECOMMENDED this 13th day of April, 2022.

_____
JOHN K. LARKINS III
United States Magistrate Judge

22